**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

NATIONWIDE EQUIPMENT COMPANY,

                Plaintiff,

vs.                                              Case No. 3:05-cv-236-J-32HTS

MICHEL ALLEN, etc., et al.,

                Defendants.

## **ORDER**

This case is before the Court on Plaintiff's Application for Preliminary Injunction (Doc. 3). The parties have fully briefed the issues and provided documentary support for their positions (see Docs. 1, 2, 6, 18, 20, 23, 28, 32, 34, 36, 37, 38 and Doc. S-1 (sealed affidavit of Edward Kostenski)). The Court held a 3 ½ hour evidentiary hearing followed by argument on May 9, 2005, the record of which is incorporated by reference. The Court also incorporates by reference the two earlier non-evidentiary hearings held in this case on March 17, 2005 and April 6, 2005.

### **I. Background**

Plaintiff, Nationwide Equipment Company ("Nationwide"), is a Jacksonville, Florida based international seller of heavy equipment established in 1985 by Nationwide founder and president, Edward Kostenski. Between 1989 and the present, Nationwide has sold more than 6,000 pieces of heavy equipment to customers in over 50 countries. In February 2002 Kostenski hired defendant Michel Allen to work for Nationwide selling heavy equipment to developing markets. Although plaintiff claims that at some point during Allen's employment

with Nationwide, Allen was asked to sign a non-compete agreement, plaintiff acknowledges that Allen never did so and that no non-compete agreement was ever in place during the time Allen was employed by Nationwide. Allen worked for Nationwide as the Director of International Sales, focusing nearly exclusively on the African market until February 2005, when Allen left Nationwide's employ.[1]

On March 16, 2005, Nationwide filed a nine-count complaint alleging that Michel Allen and his wife and business partner, Suzette Allen, engaged in a conspiracy to misappropriate trade secrets, trademarks and the reputation of Nationwide and to divert funds and contracts from Nationwide to Pioneer Equipment Company and Pioneer Equipment Nigeria, Ltd., companies established by the Allens, which are now competing with Nationwide for business in the African market.[2] Also on March 16, 2005, Nationwide filed a motion for a temporary restraining order and an application for a preliminary injunction, seeking to restrain and enjoin the Allens from representing themselves or their companies as being Nationwide affiliates, from inducing any Nationwide customers to break existing contracts with Nationwide, from using Nationwide's customer lists to solicit business for Pioneer or other third party competitors of Nationwide, from using any of Nationwide's outstanding quotations to offer competing quotes, and from diverting any funds due Nationwide to financial accounts controlled by the Allens.

---

[1] It is not entirely clear whether Allen was terminated or resigned. The Court need not resolve that question to rule on this motion.

[2] On March 16, 2005, plaintiff filed an Amended Complaint naming the Allens' companies, Pioneer Equipment Company and Pioneer Equipment Nigeria, Ltd., as additional defendants. See Doc. 6.

The following day, March 17, 2005, the Court held a telephone status conference with counsel for both sides on the motion for temporary restraining order and entered an Order temporarily restraining defendants from disclosing Nationwide's customer list; from issuing quotations to prospective buyers of heavy equipment to whom Nationwide had issued quotations for the same equipment as of February 5, 2005 when Allen left Nationwide's employ; from contacting or soliciting business from Nationwide customers or prospective customers concerning the outstanding quotations pending as of February 5, 2005; from instructing Nationwide customers to transfer funds due and owing to Nationwide to accounts controlled by the Allens; and from disclosing or utilizing Nationwide's trade secrets.[3]  Doc. 11.  The Court set the matter for a hearing on the motion for preliminary injunction which, at defendants' request, the Court later continued until April 6, 2005.

At the April 6, 2005 hearing, it became clear that the parties needed to engage in discovery before the Court could resolve the motion for preliminary injunction.  Defendants, however, were unwilling to continue under the terms of the Temporary Restraining Order and the Court agreed to rescind some of the broader aspects of the TRO.  The Court continued the restrictions against disclosing Nationwide's customer lists, against instructing Nationwide customers to divert to defendants' accounts funds owed Nationwide; and against disclosing or using Nationwide trade secrets.  The Court also narrowed the restriction against contacting Nationwide customers who were in some stage of negotiation with Nationwide so that defendants would only be restrained from interfering with "executory contracts" pending

---

[3]In compliance with the Order, plaintiff posted a $100,000.00 bond to secure payment of damages resulting from any wrongful issuance of the TRO.  See Doc. 17.

at the time Allen left Nationwide. The Court instructed plaintiff to provide a list of such contracts (which it did on April 12, 2005), and permitted defendants to move to modify the list (which they did in their supplemental response in opposition to the motion for preliminary injunction, filed on May 5, 2005). After allowing the parties to engage in discovery, the Court reconvened the hearing on the motion for preliminary injunction on May 9, 2005, hearing live testimony from the two key witnesses in this case, Edward Kostenski and Michel Allen, as well as from two individuals who have had business dealings with both Kostenski and Allen, Ricky Dale Calton and Otoabasi Asuquo Ansa. The Court also heard excerpts of videotaped deposition testimony of Michel Allen and Suzette Allen and received transcripts of depositions of Edward Kostenski and Suzanne Kostenski, Mr. Kostenski's wife and a Nationwide employee. Both parties submitted additional documentary evidence during the hearing as well. See Docs. 42, 43 (parties' exhibit lists). Although the evidence is not recounted here in full, the Court has carefully considered all of it in reaching this decision.

## II. Standard of Review

To secure a preliminary injunction, plaintiff must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [plaintiff] outweighs whatever damage the proposed injunction may cause to the moving party; and (4) if issued, the injunction would not be adverse to the public interest." Charles H. Wesley Education Foundation, Inc. v. Cox, ___ F.3d ___, 2005 WL 1121981, at *4 (11th Cir. May 12, 2005) (citation and quotation omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites."

Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (citation and quotation omitted). Because each of the four elements must be proven to secure injunctive relief, "[i]f any element is not proven, there is no need to address the others." Sofarelli v. Pinellas County, 931 F.2d 718, 724 (11th Cir. 1991).

### III. Discussion

As noted above, the Court originally entered a fairly restrictive Temporary Restraining Order on March 17, 2005. During the course of the following hearings, it became evident that defendants would not object to the continuance of some of those terms, including the restraint from attempting to divert funds due Nationwide (which defendants deny doing) or from disclosing or using any of Nationwide's genuine trade secrets or from disclosing a list of Nationwide customers to others. Defendants do object, however, to the restraint against utilizing Nationwide's trade secrets to the extent that Nationwide has characterized its entire customer list as being a trade secret (the "customer list as trade secret" issue). Additionally, while defendants do not object to the restraint against issuing quotations to prospective customers for the same equipment those customers had agreed to purchase from Nationwide before Allen's departure, at the April 6, 2005 hearing the Court agreed with defendants that plaintiffs must prove the existence of those agreements before the Court would consider extending that aspect of the temporary restraining order (the "executory contract customers" issue). Finally, plaintiff now moves the Court to enjoin defendants from engaging in business with or representing two firms (Oxygen Generating Systems Incorporated and Ahern Industries) which plaintiff claims have entered into exclusive

agreements with Nationwide[4] (the "third party contracts" issue).  In addressing each of these issues, the parties' focus has largely been confined to a consideration of whether plaintiff has demonstrated a substantial likelihood of success on the merits and the Court therefore addresses each of these issues within that context.[5]

A.  The "Customer List as Trade Secret" Issue

In considering this as well as the other issues, it is important to reiterate that Michel Allen never entered into a non-compete agreement with Nationwide and plaintiff readily acknowledges that "a former employee may compete with a former employer."  Doc. 37 at 13.  However, plaintiff argues defendants should be enjoined from contacting Nationwide customers in Africa with whom Allen came into contact during his employment with Nationwide, claiming that the list of such customers is a trade secret.[6]

"Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable

---

[4]Plaintiff's original application for a temporary restraining order and preliminary injunction did not seek to specifically restrain or enjoin defendants from engaging in business with Oxygen Generating Systems, Inc. or Ahern Industries.  Whether that relief could arguably be subsumed within one of the more general categories of relief requested by those motions is debatable.  Nonetheless, at this juncture, it is clear that plaintiff does seek to enjoin defendants from such conduct.  See Doc. 37 at 11-13.

[5]Among the other required findings, the Court entered the TRO upon finding plaintiff had sufficiently shown a substantial likelihood of success on the merits at least as to Count IX of the amended complaint, titled "Misappropriation of Trade Secrets and Unfair Competition." See Doc. 6 (Amended Complaint).

[6]If plaintiff demonstrates that its customer lists are trade secrets, then plaintiff would likely be establishing a substantial likelihood that it could prove success on the merits of Count IX (misappropriation of trade secrets and unfair competition claim) based on defendants' use of the customer lists.

efforts to maintain its secrecy." Amer. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998), citing Fla. Stat. § 688.002(4). The Eleventh Circuit further explained:

> Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection. Moreover, an employer may not preclude its former employee from utilizing contacts and expertise gained during his former employment. In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy.

Amer. Red Cross, 143 F.3d at 1410 (citations and quotations omitted) (emphasis supplied).

In American Red Cross, the Eleventh Circuit reviewed a preliminary injunction enjoining the Palm Beach Blood Bank from, among other things, using the donor lists of its competitor, the American Red Cross, where the Palm Beach Blood Bank had obtained the American Red Cross donor list when it hired several American Red Cross employees. Id. at 1409. In vacating the preliminary injunction, the Eleventh Circuit held that the American Red Cross had not shown a substantial likelihood of success on the merits where it had not demonstrated that its donor list was a trade secret. Id. at 1409-11. Although the American Red Cross maintained that its lists had remained secret, the Palm Beach Blood Bank presented evidence that "[s]ome of the Red Cross's lists appear[ed] to have been posted on a computer bulletin board freely accessible to Red Cross's competitors, [and] many of Red Cross's donor groups ha[d] publicly revealed their sponsorship." Id. at 1411. The Court also noted evidence presented by the Palm Beach Blood Bank that some of the former American Red Cross employees had "professional relationships with individual Red Cross donors,

7

relationships which these workers may now rely upon without infringing any of Red Cross's rights." Id., citing Templeton v. Creative Loafing Tampa, Inc., 552 So.2d 288, 290 (Fla. 2nd DCA 1989).

In Templeton, Florida's Second District Court of Appeal reversed a decision to enjoin a former music magazine advertising department employee from using the music magazine's lists of advertising customers to promote his new competitor magazine because, not only were the lists of advertisers available by looking at past issues of the magazine or a telephone book or newspaper, but the arguably secret information of the actual contact person at each advertiser had been gathered by the employee "as a result of his experience working for [the music magazine] and . . . he did not need a secret list to enable him to ascertain [the] identity" of those contacts. Templeton, 552 So. 2d at 290. Thus, the court held that in the absence of a non-compete agreement, the former employee "[could] not be precluded from utilizing contacts and expertise gained during his former employment." Id.

In Templeton, the court distinguished the music magazine's customer list from customer lists in other cases, such as Unistar v. Child, 415 So.2d 733 (Fla. 2nd DCA 1982), and others, in which customer lists were held to be trade secrets because in those cases the lists were "not available from public sources, were distillations of larger lists, and great effort and expense went into their preparation." Templeton, 552 So.2d at 290. Plaintiff here relies heavily on the Unistar case, in which Florida's Third District Court of Appeal reversed the denial of injunctive relief to a diamond dealer, Unistar, seeking to enjoin a group of its former employees from using Unistar's customer list of financial planners to solicit customers for their new competing diamond business. 415 So.2d at 733-34. In holding that Unistar's

8

customer list was a protectable trade secret, the court relied on "uncontroverted" evidence that the customers list of 1,850 financial planners, each of whom had signed with Unistar to be a "dealer," had been distilled from a larger list of 12,000 financial planners at a cost of $800,000 over a three year period, "reflecting considerable effort, knowledge, time and expense" by Unistar and that Unistar had periodically updated its list and took measures to ensure employees kept the lists at their desks and did not remove them from Unistar's office. Id. at 734.  Thus, notwithstanding the lack of any non-compete agreements, the appellate court held Unistar's trade secret was being infringed by its former employees' use of Unistar's customer list and remanded the case for the entry of a preliminary injunction to enjoin such use. Id. at 734-35.

Here, plaintiff claims that, like Unistar, it has invested significant resources in the creation of its customer list, that it derives substantial value from maintaining the secrecy of its list and that it takes reasonable efforts to maintain the secrecy of the list, such as only permitting certain employees to view its customer lists. Even if the Court were to agree that Nationwide has expended significant resources to develop its customer list,[7] unlike in Unistar, where the evidence was uncontroverted, here defendants have presented evidence raising significant challenges to Nationwide's contention that the customer list itself is maintained as a secret. Defendants presented evidence that during Allen's employment with Nationwide, his primary customer contact database was maintained on his palm pilot, as opposed to on any password protected computer program maintained in Nationwide's office;

---

[7]Defendants contest this point, claiming Nationwide's financial investment in developing the African market has been largely limited to the reimbursement of Allen's expenses.

that Nationwide lists the identity of many of its customers on its website; that EXIM bank, overseas trade organizations, government agencies and embassies provide lists of African customer and banker contacts; and that over half of Nationwide's customer base is listed on EXIM's publicly available records.  Moreover, unlike in Unistar, where the financial planners signed agreements to become Unistar dealers, defendants here claim the typical Nationwide customer routinely shops and buys from multiple sources.

The Court therefore finds this case distinguishable from Unistar and further finds that, given the conflicting evidence, Nationwide has not shown that its customer list is a protectable "trade secret."  See Am. Red Cross, 143 F.3d at 1409-11.  See also, Mittenzwei v. Indus. Waste Serv., Inc., 618 So.2d 328, 329 (Fla. 3rd DCA 1993) (distinguishing Unistar and finding customer list not a trade secret where former company salesperson who started competing business used the relationships she developed over the years selling to company customers).  Therefore, Nationwide has failed to demonstrate a substantial likelihood of success on the merits as to this issue.  Thus, the Court will dissolve that aspect of the TRO which restrained defendants from contacting Nationwide customers in Africa with whom Allen came into contact during his employment with Nationwide.

B.  The "Executory Contract Customers" Issue

The original TRO restrained defendants from issuing quotations for equipment to any Nationwide customer or prospective customer with whom Nationwide had an outstanding quotation pending as of February 5, 2005 when Allen left Nationwide.  Defendants conceded that, notwithstanding the lack of any non-compete agreement, interference with such contracts could be a breach of a duty of loyalty owed Nationwide by Allen during his

employment.[8]  At the time of the entry of the TRO, plaintiff represented that there were 550 such outstanding quotations.  At the April 6, 2005 hearing, following Nationwide's disclosure that in fact some of the outstanding quotations were merely offers by Nationwide that were not accepted or that had expired, the Court determined that it would rescind this aspect of the TRO to the extent that it would only restrain defendants from issuing quotations to customers who had entered into "executory contracts" with Nationwide, meaning customers who were in the process of closing a deal, as evidenced by either financing agreements or other documentation.

On direction from the Court, on April 12, 2005, plaintiff provided defendants and the Court with two customer lists, an "A" list of 202 companies each followed by a Nationwide invoice number, identified as confirmed executory contracts, which Kostenski explained to be "a list of people that have confirmed their interest for financing for heavy equipment and people we've actually given quotes to that have told us this is equipment they want to purchase from us regarding to [sic] the invoice number" and a "B" list of 69 companies each followed by a Nationwide invoice number, identified as contracts in financing, which Kostenski explained were deals "moving into the final stages [as evidenced by] letters of credit, financing, arranging financing where they've confirmed that in writing."  Doc. 43

---

[8]Thus, even if the customer list itself is not a trade secret, defendants essentially conceded at the hearing that it would be improper for Allen to contact a Nationwide customer, knowing, because of his employment with Nationwide, the specific details about an accepted Nationwide quote to that customer for specific equipment and to use that knowledge to make the customer a better offer- - to use "inside information" as the Court and parties termed it at the hearing (which scenario differs from a customer contacting Allen to inquire as to whether he could beat the Nationwide quote).

(Defendants' Exhibit List) at Exhibit 1 (transcript of April 20, 2005 deposition of Edward Kostenski) at pp. 7-8.  None of the supporting documentary evidence described by Kostenski is attached or referenced- - the lists are merely a series of company names followed by invoice numbers.  See Doc. S-2.

In their May 15, 2005, filing, defendants object to the lists as being "purposefully incomplete and vague[,] leaving out transaction details" necessary for defendants to effectively verify the existence of these contracts.  Doc. 32 at 1.  Defendants further object that the lists are suspect because certain customers identified on those lists, including Mr. Ansa, from whom the Court heard live testimony at the May 9, 2005 hearing, have denied that they are now engaged in any contract negotiations with Nationwide and some of the listed customers have suggested that Nationwide sent them unsolicited quotes following Allen's departure.[9]  Defendants also claim that Nationwide quotes expire by their express terms within 30 days after issuance.

Given the lack of any verifiable detail or actual documentation to support plaintiff's lists, and considering the evidence presented by defendants,[10] the Court finds plaintiff has failed to establish that the quotations contained in the A and B lists are executory

---

[9]To the extent plaintiff moved to strike any of the affidavits relied on by the Court, upon consideration of plaintiff's motion (Doc. 23) and defendant's response (Doc. 28), that motion is denied.

[10]See, for example, the testimony of Mr. Otoabasi Asuquo Ansa from the May 9, 2005 hearing.  See also, Doc. 38, Exhibit 16(a) (sworn statement of Mr. Ansa); Doc. 38, Exhibit 16(b) (sworn statement of Mr. Aniete Umana, AEC Works Ltd.); Doc. 38, Exhibit 16(c) (d) (copies of allegedly unsolicited e-mails dated April 5, 2005, sent by Mr. Kostenski to multiple parties, including some of whom are on plaintiff's executory contract customer lists, offering equipment quotations from Nationwide).

agreements due to be protected from interference by defendants. Moreover, significant time has now passed since Mr. Allen's departure, meaning many Nationwide quotations which were not accepted are now expired. Thus, the Court will dissolve that aspect of the TRO which restrained defendants from issuing quotations to any prospective purchaser of heavy equipment who had received a quotation from Nationwide for the same equipment needs and which restrained defendants from closing any contracts in progress at the time of the TRO's issuance. See e.g., Four Seasons Hotels and Resorts, B.V., 320 F.3d at 1210 ("A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.") (citation and quotation omitted). In doing so, the Court is not sanctioning any particular activity on the part of defendants or saying that their activities might not ultimately be found to be actionable under one or more of plaintiff's counts of its amended complaint. Rather, the Court is merely finding that plaintiff has failed to provide sufficient evidentiary support for the Court to fashion terms which would not be so overbroad as to be beyond the permissible scope of an injunction, which must be tailored so as not to enjoin lawful activity. Cumulus Media, Inc. v. Clear Channel Communications, Inc., 304 F.3d 1167, 1178 (11th Cir. 2002).

C.  The "Third Party Contracts" Issue

Plaintiff seeks to enjoin defendants from engaging in business with or representing Oxygen Generating Systems Incorporated ("OGSI"), an oxygen plant manufacturer, or Ahern Industries, an asphalt plant manufacturer run by Patrick Ahern, who formerly worked as a sales manager for Hotmix Industries Inc., an asphalt plant manufacturer which is now dissolved. While sales of oxygen and asphalt plants are not Nationwide's primary business,

such plants are often needed by Nationwide's heavy equipment customers and Nationwide is attempting to develop these new markets. In pursuit of these new markets, Nationwide entered into "Confidentiality and Non-Circumvention Agreements" with both OGSI and Hotmix Industries. These agreements provide that business information disclosed between Nationwide and the respective companies would remain confidential and would not be used by either party for any purpose other than evaluating whether to enter a transaction and that Nationwide would not be circumvented in any resulting transaction. See Doc. 42, Exhibits 3 & 5. Plaintiff claims that while still a Nationwide employee, Allen induced OGSI and Ahern Industries to breach their agreements with Nationwide and to enter into identical confidentiality and non-circumvention agreements with Allen's company, Pioneer Equipment. See Doc. 42, Exhibits 4 & 6.

First, it is not clear that by signing agreements with Pioneer, OGSI or Hotmix breached their agreement with Nationwide because the agreements do not purport to make Nationwide an exclusive representative of OGSI or Hotmix products. Second, Allen testified that even after he entered subsequent agreements on behalf of Pioneer, Nationwide would still receive a commission on any deals Allen brought to OGSI or Ahern while Allen was employed by Nationwide. Finally, defendants have cast doubt on the enforceability of these agreements based on the current status of the parties with whom Nationwide had contracted. OGSI's Sales and Marketing Manager stated that OGSI was purchased by a new company in February of 2004, that not all of OGSI's previous agreements were renewed, and that as of May 3, 2005, OGSI's agreement with Nationwide still had not been renewed. See Doc. 36, Exhibit 15(e) (sworn statement of Bob Schlehr). Similarly, Hotmix's former general

manager and a member of its Board of Directors stated in an affidavit that Hotmix is now dissolved.  See Doc. 38, Exhibit 16(e) (affidavit of Andy Cox).  Based on this presentation, the Court cannot find plaintiff has shown a substantial likelihood of success on the merits such that would require the Court to enjoin defendants from engaging in business with or representing OGSI or Ahern Industries.

## IV. Conclusion

For all the reasons stated above, the TRO is due to be dissolved in its entirety and the motion for preliminary injunction is due to be denied.[11]  However, notwithstanding that the Court has reached this decision, the parties should not assume that the Court has prejudged the merits of any of the allegations raised in plaintiff's amended complaint.  Indeed, the Court cannot predict what the factfinder[12] will ultimately conclude based upon a fully developed record and under a preponderance of the evidence standard.

Accordingly, it is hereby

**ORDERED**:

1. Plaintiff's Application for Preliminary Injunction (Doc. 3) is **DENIED**.

2. The Temporary Restraining Order entered on March 17, 2005 (Doc. 11) is **DISSOLVED**.

---

[11] To the extent defendants voluntarily agreed not to engage in certain activity, such as representing themselves as Nationwide affiliates, diverting funds due Nationwide to accounts controlled by Allen or using any genuine trade secrets belonging to Nationwide, defendants proceed at their peril if they choose to renege on that agreement.

[12] It appears from the pleadings that the parties intend for this to be a bench trial.

3. No later than **June 20, 2005**, any party may file a motion regarding the disposition of the Security Bond posted as security during the pendency of the TRO.

4. The parties are encouraged to set an early date for mediation and to the extent they do so, the Court would favorably entertain a motion for an extension of time for the filing of their Case Management Report. In the meantime, the Court has taken the other pending motions in this case under advisement.

**DONE AND ORDERED** at Jacksonville, Florida this 24th day of May, 2005.

_____
TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record